# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ROMEO TAMEZ,** | **CIVIL ACTION** |
| **Plaintiff** | |
| **VERSUS** | **NO. 15-4941** |
| **ANADARKO PETROLEUM** | **SECTION: "E" (1)** |
| **CORPORATION, ET AL.,** | |
| **Defendants** | |

## ORDER AND REASONS

Before the Court is a Motion for Summary Judgment filed by Defendants Stranco Services, LLC ("Services") and Stranco Rental, LLC ("Rental").[1] Rental seeks summary judgment arguing "there are no factual or legal bases for any liability exposure"[2] on its part; Services seeks summary judgment pursuant to the Fifth Circuit's "borrowed-employee doctrine."[3] Plaintiff opposes the motion as it relates to Services.[4]

## I.    BACKGROUND

Plaintiff alleges that on or about October 13, 2014, he sustained serious burns to his face, chest, neck and other parts when breaking down a flange aboard the LUCIOUS SPAR, a platform located off the Gulf of Mexico,[5] which Plaintiff alleges Defendants owned, operated and/or managed.[6] Plaintiff's injuries occurred when a blast of

---

[1] R. Doc. 99.
[2] R. Doc. 99 at 1.
[3] *Id.*
[4] R. Doc. 113.
[5] Although Plaintiff initially claimed the LUCIOUS SPAR was a vessel, the parties have since stipulated that it is not a vessel, but rather a platform. R. Doc. 45, at 1.
[6] R. Doc. 1.

pressurized air and water hit him while he was dismantling a flange[7] after a fellow employee "didn't bleed off that section where the check valve was."[8]

Stranco Group, LLC ("Stranco") owns and is the sole member of Rental;[9] similarly, Stranco owns and is a member of Services.[10] Defendant Anadarko Petroleum Corporation ("Anadarko") is the owner/operator of the LUCIOUS SPAR.[11] To assist with the platform's operation, Anadarko contracted with Defendant Dolphin Services, LLC ("Dolphin"), which, in turn, contracted with Stranco to perform the hydrostatic testing and torquing on the LUCIOUS SPAR.[12] Stranco designated Services as the Stranco entity responsible for performing the testing on the platform.[13] On May 27, 2017, Rental entered into a Master Service Contract[14] with Technical Marine Maintenance Mississippi, LLC ("TMM"), a contract labor provider that hires out qualified personnel to companies in the hydrostatic testing and torquing industry.[15] TMM hired Plaintiff in 2013 or 2014.[16] TMM provided Plaintiff with regular safety classes before sending him to work.[17] Thereafter, TMM dispatched Plaintiff to Services' office where Services personnel interviewed Plaintiff for work on the LUCIOUS SPAR.[18] Once Services approved Plaintiff, Services

---

[7] *Id.*
[8] R. Doc. 99-4 at 39.
[9] R. Doc. 99-6 at 1.
[10] *Id.*
[11] R. Doc. 99-1 at 20; R. Doc. 81 at 3.
[12] R. Doc. 99-6 at 2. More specifically, Rental entered into an agreement with Gulf Island Fabrication, Inc. and its subsidiaries, including Dolphin. *Id.* Thereafter, pursuant to the agreement between Rental and Gulf Island, Rental and Dolphin entered into a subcontractor agreement regarding hydrostatic testing services to be performed on the LUCIOUS SPAR. *Id.*
[13] R. Doc. 99-6 at 2.
[14] R. Doc. 113-3.
[15] R. Doc. 99-4 at 5; R. Doc. 99-5 at 18.
[16] R. Doc. 99-4 at 3–4. The exact date is not clear. Plaintiff recalls being hired in "[20]14. Maybe [20]13." *Id.*
[17] *Id.* at 14.
[18] *Id.* at 17–18.

flew him and other Services employees to the platform to begin working. Plaintiff worked on the LUCIOUS SPAR from this time until he was injured on October 13, 2014.[19]

On October 2, 2015, Plaintiff filed his Original Complaint against Anadarko, Rental, Dolphin, and twenty "John Doe" Corporations.[20] On December 6, 2016, Plaintiff filed his second supplemental and amended complaint additionally naming Services as a defendant.[21] On July 24, 2017, Defendants Service and Rental filed a motion for summary judgment.[22] Rental argues it is undisputed that Plaintiff's injuries were caused by human error. Thus, Rental avers, because the tools it supplied were not faulty, Plaintiff has no cause of action against it. Services argues it is immune from tort liability under the borrowed servant doctrine.

## II.     LEGAL STANDARD

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23] "An issue is material if its resolution could affect the outcome of the action."[24] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing

---

[19] Although it is unclear when Plaintiff's employment with Services began, Plaintiff worked on the LUCIOUS SPAR shortly after he began his employment with TMM, R. Docs. 99-2 at 2, 113-1 at 2, which was "six or seven months before the accident happened," R. Doc. 113-10 at 5. It is undisputed that "Plaintiff worked for no other company other than Stranco from the time he was hired by TMM until a year after the accident at issue herein." R. Docs. 99-2 at 3, 113-1 at 3.

Plaintiff worked between fourteen and twenty-one day "hitches" while on the platform. R. Doc. 113-4 at 160; R. Doc. 113-10 at 12. According to his deposition testimony, although it is not clear exactly how long Plaintiff worked on the LUCIOUS SPAR before his injury, it is undisputed that it was at least two weeks. R. Doc. 113-4 at 159 ("I might have been there like two or three hitches" ").

[20] R. Doc. 1.

[21] R. Doc. 52. After filing his original complaint, Plaintiff has filed four supplemental and amended complaints. R. Docs. 23, 52, 63, 86. The remaining Defendants in this case are Rental; Services; Dolphin; Anadarko; M&J Energy Group, LLC; Delta Constructors, Inc; Gibson Applied Technology & Engineering Texas, Inc. *See* R. Docs. 23, 52, 63, 86.

[22] R. Doc. 99.

[23] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[24] *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

the evidence."[25] All reasonable inferences are drawn in favor of the non-moving party.[26] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[27]

 "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[28] If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, to satisfy Federal Rule of Civil Procedure 56's burden, the moving party must do one of two things: it "may submit affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[29] When the moving party chooses the latter option it

> must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record.[30]

If the moving party fails to carry this burden, the motion must be denied.

 If the moving party successfully carries its burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the

---

[25] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[26] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[27] *Hibernia Nat. Bank v. Carner*, 997 F.2d 94, 98 (5th Cir. 1993) (citing *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147–48 (5th Cir. 1992)).
[28] *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 323).
[29] *Celotex*, 477 U.S. at 331.
[30] *Id.* (internal citation omitted).

pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[31] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[32] "[U]nsubstantiated assertions are not competent summary judgment evidence."[33] Rather, "the party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[34]

### III.   ANALYSIS

In its motion for summary judgment, Rental avers Plaintiff's evidence is insufficient to establish an essential element of his negligence cause of action; specifically, Rental offers evidence demonstrating its only involvement with Plaintiff was to supply Services with tools and equipment for its work on the LUCIOUS SPAR and that "there were no problems or deficiencies with respect to the tools."[35] Plaintiff does not contest these facts.[36] Similarly, Services contends no material fact issue remains, and it is entitled to judgment as a matter of law because Plaintiff was Services' borrowed-employee. This portion of Defendants' motion is opposed.[37]

---

[31] *Id.* at 322–25.
[32] *Id.* at 332–33.
[33] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324).
[34] *Id.* (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).
[35] R. Doc. 99-1 at 22.
[36] *See generally* R. Doc. 113.
[37] R. Doc. 113.

As an initial matter, Plaintiff makes much of the fact that TMM's contract was with Rental, not Services. The Court finds this distinction immaterial—with which company TMM contracted is not an element of the Court's borrowed servant analysis.[38] Moreover, in this case, Dolphin entered into an agreement with Stranco, which designated Services as the Stranco entity responsible for providing the contracted for services. Under TMM's contract with Rental, Rental "at all time[s]" retained "the right to award such work as it deems appropriate."[39] Rental has no employees.[40] Thus, any work Rental deemed appropriate for TMM employees was based on Services' needs. Contrary to Plaintiff's assertions, that TMM did not hold a similar contract with Services directly does not create a material fact dispute sufficient to preclude this Court's granting of summary judgment. Instead, the Court looks to "[t]he reality at the worksite and the parties' actions in carrying out a contract"[41] in determining whether Plaintiff was Services' borrowed-employee.

## A. Rental's Liability

Rental argues "there are no factual or legal bases for any liability exposure to Rental"[42] and that, although Rental "furnished certain tools and equipment used by the

---

[38] *See Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir.), *modified on reh'g*, 841 F.2d 572 (5th Cir. 1988).

[39] R. Doc. 113-3 at 2.

[40] *Id.* at 2–3. On this point, Rental offers the testimony of Quinn M. Strander, an owner and member of the Stranco Group, LLC. R. Doc. 99-6 at 1–3. Plaintiff's cites two pieces of evidence in opposition to this fact. First, Plaintiff points to the Master Service Contract, without explanation. R. Doc. 113-1 at 4 ("Contested; Plaintiff was working on the LUCIUS SPAR pursuant to a contract between TMM and Stranco Rental, LLC."). However, the contract's existence does not create a material fact dispute as to whether Rental has employees; Plaintiff did not become Rental's employee by virtue of the contract. *See* R. Doc. 113-3. Second, Plaintiff argues "[Plaintiff's] supervisors are not identified as either Stranco Services, LLC or Stranco Rental, LLC employees," and because "the deposition of Plaintiff conducted by Sttanco [sic] Rental, LLC[,]which suggests he was under the direction of supervisors from both companies or one or the other." R. Doc. 113-2 at 2–3. Defendants offered evidence that the "Stranco" employees on the platform to which Plaintiff referred were in fact Services' employees. R. Doc. 99-6 at 1–3. Plaintiff does not dispute this. Further, Services and Rental are represented by the same attorney. R. Doc. 99-2 at 6. Thus, Plaintiff has not created a material fact dispute as to whether Rental has employees.

[41] *See, e.g., Melancon*, 834 F.2d at 1245.

[42] R. Doc. 99-1 at 1.

[Services] crew for the work," "there is no evidence whatsoever to even suggest that such tools and/or equipment played any causal role in the accident."[43]

In his memorandum in opposition, Plaintiff addresses Rental's argument only in passing, merely stating that "Defendants' memorandum . . . incorrectly asserts that there is 'no factual or legal basis for any liability exposure against Rental.'"[44] He does not otherwise oppose Rental's argument. Thus, the Court finds the motion for summary judgment, as it relates to Rental, is unopposed. Although the dispositive motion is unopposed, summary judgment is not automatic, and the Court must determine whether Plaintiff has shown entitlement to judgment as a matter of law.[45]

In support of its motion, Rental provides evidence demonstrating that (1) Rental's role on the LUCIOUS SPAR was limited to supplying tools and equipment to Services,[46] (2) all of the tools and equipment it supplied were in good working order,[47] (3) Plaintiff's accident was caused by human error,[48] and (4) the employee whose error caused the accident was a Services employee.[49] In the absence of any opposition filed by Plaintiff, the Court concludes that this satisfies Plaintiff's burden to show that the Plaintiff does not have a direct action against Rental. Thus, judgment in favor of Rental is warranted.

---

[43] *Id.* at 2.
[44] R. Doc. 113 at 1.
[45] *See, e.g.*, Fed. R. Civ. P. 56(a); *Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006).
[46] R. Doc. 99-6 at 2–3.
[47] *Id.* at 3–4; R. Doc. 99-6 at 2–3.
[48] R. Doc. 99-2 at 5; R. Doc. 113-1 at 3.
[49] R. Doc. 99-2 at 5; R. Doc. 113-1 at 4 ("Plaintiff acknowledges that [Services'] employees were the workers who caused the accident.").

## B. Whether Plaintiff was Services' borrowed servant

If Plaintiff was Services' borrowed-employee, Services is vested with tort immunity, and the Court must dismiss Plaintiff's claims against it.[50] Whether Plaintiff was Services' borrowed-employee is a question of law,[51] and "if sufficient basic factual ingredients are undisputed, the court may grant summary judgment."[52] Borrowed-employee status is governed by the Fifth Circuit's decision in *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969). In *Ruiz*, the Fifth Circuit identified nine factors to be used in determining whether an employee is a borrowed-employee of another entity.[53] The factors include:

(1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?

(2) Whose work was being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished the tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?[54]

---

[50] *English v. Wood Group PSN, Inc.*, No. 15-568, 2015 WL 5061164, at *14 (E.D. La. Aug. 25, 2015) (citations omitted) ("If the Plaintiff is W & T Offshore's borrowed-employee, W & T Offshore will thus be vested with § 905(a) tort immunity.").

[51] *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 393 (5th Cir. 2013).

[52] *Capps v. N.L. Baroid-NL Indus.*, 784 F.2d 615, 617 (5th Cir. 1986).

[53] *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969).

[54] *Melancon*, 834 F.2d at 1244 (citing *Ruiz*, 413 F.2d at 312–13; *Capps*, 784 F.2d at 616–17; *West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985); *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985); *Hall v. Diamond M. Co.*, 732 F.2d 1246, 1249 (5th Cir. 1984); and *Gaudet v. Exxon*, 562 F.2d 351, 355 (5th Cir. 1977)).

"While the courts do not use a fixed test and do not decide the issue based on one factor, the courts place the most emphasis on the first factor, control over the employee."[55] The Court considers each *Ruiz* factor in turn.

1. <u>Who has control over the employee and the work he is performing?</u>

As explained above, although no single factor or combination of factors is dispositive, the Fifth Circuit "has considered the first factor—control—to be the central factor."[56] This factor requires the Court to distinguish "between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."[57]

Services contends it had authoritative direction and control over Plaintiff because, "From the moment plaintiff was sent by TMM to [Services] to work aboard the LUCIUS SPAR, plaintiff worked under the direct supervision and control of [Services] personnel."[58] According to Services, it, not TMM or Rental, sent Plaintiff to work on the LUCIOUS SPAR, "where he was put in a crew working under the direction of a [Services] team leader."[59] In response, Plaintiff agrees that he (1) was "a contract laborer" "working with other technicians employed by [Services]";[60] and (2) "did not perform any work directly for TMM, but rather worked for companies to whom he was provided by TMM," subject to the terms of the Master Service Agreement.[61]

---

[55] *Capps*, 784 F.2d at 617 (citing *Ruiz*, 413 F.2d at 312; and *Hebron v. Union Oil Co. of Ca.*, 634 F.2d 245, 247 (5th Cir. 1981) (per curiam)).
[56] *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 677 (5th Cir. 1993) (per curiam).
[57] *Ruiz*, 413 F.2d at 313 (internal quotation marks omitted) (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909)).
[58] R. Doc. 99-1 at 7.
[59] R. Doc. 99-1 at 8.
[60] R. Doc. 99-2 at 2; R. Doc. 113-1 at 2 ("Plaintiff concedes that Stanco [sic] Services, LLC was tasked with performing the testing and torqueing [sic] and plaintiff was a contract laborer working with other employees of . . . Services . . . .").
[61] R. Doc. 99-2 at 2; R. Doc. 113-1 at 2; R. Doc. 99-4 at 8.

In *Melancon v. Amoco Production Co.*, the Fifth Circuit affirmed the district court's finding, among others, that the control factor weighed in favor of borrowed-employee status.[62] In particular, the Fifth Circuit concluded that Amoco, the alleged borrowing employer, "clearly had control" over the plaintiff because the plaintiff "took orders" from Amoco personnel "who told him what work to do, and when and where to do it."[63] The Fifth Circuit further explained that the lending employer in *Melancon* "gave no instructions" to the plaintiff "except to go to the Amoco field and perform the work requested by Amoco personnel."[64]

Similarly, in *Billizon v. Conoco, Inc.*, the Fifth Circuit again affirmed the district court's finding that the control factor weighed in favor of borrowed-employee status.[65] In support, the Fifth Circuit explained that the plaintiff was regularly supervised by an employee of Conoco, the alleged borrowing employer.[66] Moreover, the plaintiff attended "daily tailgate meetings" conducted by Conoco personnel to "discuss safety and work-related issues."[67] The Fifth Circuit in *Billizon* also noted that no supervisors from the plaintiff's lending employer were in the field to oversee his work.[68]

In this case, Services employees supervised Plaintiff's work, not TMM. Plaintiff's entire tenure with Services was spent working on the LUCIOUS SPAR where he took orders, directions, and instructions from Services personnel and Services personnel alone.[69] In his deposition testimony, for example, Plaintiff testified

---

[62] 834 F.2d at 1244–45.
[63] *Id.* at 1245.
[64] *Id.*
[65] *Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993).
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] R. Doc. 99-2 at 2–4; R. Doc. 113-1 at 2–4.

Q: Whatever work you were going to be performing [on] the LUCIUS SPAR was instructed to you by the [Services] team leader; correct?
A: Yes.
Q: The other crew members that worked under the [Services] team leader, if they were employed by TMM, they would likewise get their instructions from the [Services] team leader?
A: If they are working that crew, that's where they get their instructions from.[70]

From these undisputed facts, and in light of Fifth Circuit case law detailed above, it is clear that Services had authoritative control over Plaintiff and that Plaintiff took direction from Services personnel.

Although Plaintiff concedes "from the time [he] was sent to [Services] by TMM, through the date of the accident, [he] worked exclusively under a crew of other [Services] employees under a team leader employed by [Services],"[71] Plaintiff nevertheless argues that TMM controlled his work, which would weigh against a finding that Plaintiff was a borrowed-employee of Services.[72] Plaintiff points to the contract between TMM and Services, the Master Service Contract,[73] as support for the position that he was subject to the direction and control of TMM.[74] The Master Service Contract states, however, that Rental "may terminate any particular work or service being performed under [the] contract at any time at its sole discretion."[75]

Even if TMM had retained the right to hire, fire, and discipline its employees, this does not lead to the conclusion that Plaintiff was, under the *Ruiz* test, subject to the

---

[70] R. Doc. 99-4 at 22–24. Plaintiff also stated that the team leaders, who were employed by Services, would take orders from other Services supervisors who would "give [the team leader] a list, the packet of what needs to be done. And then [the team leader] would come to us [and say,] 'Okay, we're going to need these tools and these tools. We're going onto this floor and this deck and this deck. And we're gonna [sic] do this, this, and this. Okay.'" R. Doc. 99-4 at 23.
[71] R. Doc. 113-1 at 2; R. Doc. 99-2 at 2.
[72] R. Doc. 113-2 at 3.
[73] R. Doc. 113-3.
[74] R. Doc. 113-2 at 3.
[75] R. Doc. 113-3 at 6.

authoritative direction and control of TMM. In *Kindred v. Blake International Holdings, L.L.C.*, a court in this district faced similar facts and concluded that, even when the lending employer retained some sort of authority over the employee, it was clear that the borrowing employer had "authoritative direction and control" over the employee.[76] In *Kindred*, the employee (1) "received his daily work assignments" from the borrowing employer's personnel, (2) was directly supervised by the borrowing employer's personnel, and (3) had "little contact" with his lending employer during the "nearly two years" he worked on the borrowing employer's oil-and-gas production platform.[77] There was also evidence, however, that the employee attended "sporadic safety training classes" with his lending employer and received "some post-accident direction" from his lending employer."[78] Nevertheless, the *Kindred* court concluded that "those facts do not preclude a finding of borrowed-employee status when [the borrowing employer's] personnel told him 'what work to do, and when and where to do it.'"[79] The court further found that, even where the lending employer retained some authority over the employee, the employee was subject to the "authoritative direction and control" of the borrowing employer because "the supervision and instruction of [the borrowing employer] rose above 'mere suggestion of details or cooperation.'"[80]

In this case, the undisputed facts establish that Plaintiff (1) was directly supervised by Services personnel at all times;[81] (2) worked on the LUCIOUS SPAR for between fourteen and twenty-one day "hitches";[82] (3) received an orientation on the equipment

---

[76] *Kindred v. Blake Intern. Holdings, L.L.C.*, 805 F. Supp. 2d 278, 282 (E.D. La. 2011) (citations omitted).
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] R. Doc. 99-2 at 3–4; R. Doc. 113-1 at 3–4.
[82] R. Doc. 113-10 at 12.

and type of work that was going to be done on the platform from Services;[83] (4) wore a Services uniform;[84] (5) only spoke with people at TMM "maybe once a week" regarding certain payroll matters not relevant to the issue of control;[85] and (6) never received instructions from TMM regarding his work on the platform.[86] Even if TMM retained some limited authority over Plaintiff, the Court finds as a matter of law that Plaintiff was subject to the authoritative direction and control of Services. Accordingly, the Court finds that this factor weighs in favor of borrowed-employee status.

2. _Whose work is being performed?_

The parties agree that Plaintiff performed Services' work and only Services' work.[87] It is undisputed that "[Services] was the contractor tasked with performing [the] testing and torqueing [sic] [on the LUCIOUS SPAR],"[88] and that "Plaintiff did not ever receive any work instructions from anyone at TMM with regard to work on the LUCIOUS SPAR platform."[89] In fact, Plaintiff testified that "just [Services] workers" were involved in "pressuring the pipe[s] or bleeding [them] down," what Services was hired to do.[90] This factor supports a finding that Plaintiff was a borrowed-employee 0f Services.

3. _Was there an agreement between the original and borrowing employer?_

"In deciding this factor, courts have looked to contractual provisions and the behavior of the parties to determine whether an understanding existed."[91] In this case, TMM and Rental, not Services, executed a Master Service Contract on May 27, 2014,

---

[83] R. Doc. 99-2 at 3–4; R. Doc. 113-1 at 3–4.
[84] R. Doc. 99-2 at 3; R. Doc. 113-1 at 2.
[85] R. Doc. 99-4 at 47; R. Doc. 99-2 at 3; R. Doc. 113-1 at 3.
[86] R. Doc. 99-4 at 48.
[87] R. Doc. 99-2 at 3–4; R. Doc. 113-1 at 3–4.
[88] R. Doc. 99-2 at 2, ¶ 3; R. Doc. 113-1 at 1, ¶ 3.
[89] R. Doc. 99-2 at 3; R. Doc. 113-1 at 3.
[90] R. Doc. 99-4 at 28, 36.
[91] _LeBlanc v. AEP Elmwood, LLC_, 946 F. Supp. 2d 546, 551 (E.D. La. 2013) (citing _Brown_, 984 F.2d at 677).

pursuant to which TMM supplied skilled laborers.[92] According to Plaintiff's deposition testimony, TMM is merely a contract company that "call[s] other companies and find out if they need employees, what qualifications that those employees need, and they go see if they have people in their business that are qualified people that they are looking for. In other words, they find the people jobs. . . . They find employees for companies."[93]

Plaintiff points to a provision in the Master Service Contract as evidence that the parties' understanding was that Plaintiff would be considered an "independent contractor."[94] The "INDEPENDENT CONTRACTOR" provision provides that

> [i]t is expressly understood that [TMM] is an independent contractor and that neither [TMM] nor [TMM's] principles, partners, employees, or subcontractors are servants, agents, or employees of [Rental]. [Rental] shall designate the services it desires to be performed and the ultimate results to be obtained, but shall leave to [TMM] the methods and details of performance. [Rental] being interested only in the results obtained, and having no control over the manner and method of performance.[95]

Plaintiff's reliance on this provision fails to create a genuine issue of material fact with respect to the third *Ruiz* factor. The Fifth Circuit and the courts within it have repeatedly held that "[t]he reality at the worksite and the parties' actions in carrying out a contract . . . can impliedly modify, alter, or waive express contractual provisions."[96] "Obviously parties to a contract cannot automatically prevent a legal status like 'borrowed-employee' from arising merely by saying in a provision in their contract that it cannot arise."[97] In this case, although the Master Service Contract contains an independent-contractor provision, the reality at Services' worksite was much different. As

---

[92] R. Doc. 113-3.
[93] R. Doc. 99-4 at 5.
[94] R. Doc. 113 at 6.
[95] R. Doc. 113-3 at 2.
[96] *See, e.g., Melancon*, 834 F.2d at 1245.
[97] *Id.*

stated at length above, Services exercised direct supervision and control over Plaintiff during his tenure with TMM, all of which was spent on the LUCIOUS SPAR.[98] As a result, the Court finds that this factor weighs in favor of borrowed-employee status.

### 4. *Did the employee acquiesce?*

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them."[99] In *Brown v. Union Oil Co. of California*, the Fifth Circuit noted that the employee "worked, slept[,] and ate in [the borrowing employer's] field for a month prior to his accident. Although many of our cases affirming borrowed servant status have involved longer periods of work, one month is a sufficient amount of time for [the employee] to appreciate the new work conditions."[100]

As in *Brown*, it undisputed that Plaintiff would stay on the LUCIOUS SPAR for between fourteen and twenty-one day "hitches," before returning onshore.[101] It is also undisputed that Plaintiff would have continued working for Services but for his accident,[102] and in fact hoped to be hired by Services indefinitely.[103] It is clear that Plaintiff was aware of his work conditions and chose to continue working in them. The Court finds that, because Plaintiff was aware of his work conditions and chose to continue working in them, this factor weighs in favor of borrowed-employee status.

---

[98] R. Doc. 99-2 at 3; R. Doc. 113-1 at 3 (clarifying that Plaintiff worked for Services pursuant to the Master Service Agreement).
[99] *Brown*, 984 F.2d at 678.
[100] *Id.* (citing *Melancon*, 834 F.2d at 1241 (5 years); *Alexander v. Chevron U.S.A.*, 806 F.2d 526, 527 (5th Cir. 1986) (approximately 1 year); *Gaudet*, 562 F.2d at 355 (approximately 17 years). *But see Capps*, 784 F.2d at 616 (1 day)).
[101] R. Doc. 113-10 at 12.
[102] R. Doc. 99-4 at 42.
[103] R. Doc. 113-4 at 264.

5. _Did the original employer terminate his relationship with the employee?_

This factor does not require the lending employer to completely sever its relationship with the borrowed-employee. Instead, the focus is "on the lending employer's relationship with the employee while the borrowing occurs."[104]

In _Crawford v. BP Corp. North America Inc._, the lending employer exercised "little to no control" over the employee while the employee worked for the borrowing employer, and the lending employer "placed no restrictions" on the employee's employment with the borrowing employer.[105] In _Crawford_, this Court found that, in light of such a relationship between the employee and his lending employer, this factor weighed in favor of borrowed-employee status.[106]

Likewise, the Fifth Circuit in _Capps v. N.L. Baroid-NL Industries, Inc._, found that where the lending employer "exercised no control" over the employee while he worked for the borrowing employer and "placed no restrictions" on the employee's employment with the borrowing employer, the lending employer effectively terminated its relationship with the employee, which weighed in favor of borrowed-employee status.[107]

In _Hotard v. Devon Energy Production Co. L.P._, the Fifth Circuit reasoned that "the fact that [the employee] had no contact with [his lending employer] and was supervised totally by [his lending employer's] employees while on the platform is sufficient to meet this factor."[108]

---

[104] _Capps_, 784 F.2d at 617–18.
[105] _Crawford v. BP Corp. N. Am., Inc._, No. 13-445, 2015 WL 1190123, at *3 (E.D. La. Mar. 16, 2015).
[106] _Id._
[107] _Capps_, 784 F.2d at 617–18.
[108] _Hotard v. Devon Energy Prod. Co. L.P._, 308 F. App'x 739, 742 (5th Cir. 2009) (citing _Melancon_, 834 F.2d at 1246).

In this case, it is undisputed that "From the time plaintiff was sent to [Services] by TMM, through the date of the accident, plaintiff worked exclusively in a crew of other [Services] employees under a team leader employed by [Services]"[109] and that Plaintiff "did not perform any work directly for TMM, but rather worked for companies to whom he was provided by TMM," subject to the terms of Rental and TMM's Master Service Agreement.[110]

Even in light of these undisputed facts, Plaintiff contends that this factor does not weigh in favor of borrowed-employee status because, Services "could not terminate Plaintiff's employment with his payroll employer."[111] According to Plaintiff, because of this fact, TMM never terminated its relationship with Plaintiff.

The Court finds, however, that Plaintiff's assertion is not material to the resolution of this *Ruiz* factor. "This factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed-employee' doctrine."[112] "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs."[113] In this case, it is undisputed that, while working on the LUCIOUS SPAR, (1) Plaintiff had little contact with TMM,[114] (2) Plaintiff was supervised entirely by Services employees and supervisors,[115] and (3) Services had the right to discharge Plaintiff from his work on the LUCIOUS SPAR at any time.[116] In light of these facts, and guided by

---

[109] R. Doc. 99-2 at 2; R. Doc. 113-1 at 2.
[110] R. Doc. 99-2 at 2; R. Doc. 113-1 at 2 ("Contested as written; [t]he contract between TMM and Stranco Rental, LLC sets forth the arrangement between TMM, Stranco Rental, LLC and Plaintiff.").
[111] R. Doc. 113 at 5.
[112] *Capps*, 784 F.2d at 617–18.
[113] *Id.*
[114] R. Doc. 99-4 at 47; R. Doc. 99-2 at 3; R. Doc. 113-1 at 3.
[115] R. Doc. 99-2 at 3–4; R. Doc. 113-1 at 2–3.
[116] R. Doc. 113-2 at 3 ("Defendants had the right to have Plaintiff removed from the LUCIUS SPAR.").

the Fifth Circuit's decisions in *Capps* and *Hotard* and this Court's prior decision in *Crawford*, the Court finds that this factor weighs in favor of borrowed-employee status.

6. *Who furnished the tools and place for performance?*

It is undisputed that TMM did not provide the tools and equipment needed to perform the work on the LUCIOUS SPAR.[117] It is similarly undisputed that Rental supplied the tools and equipment needed to complete the hydrostatic testing and torquing on the platform.[118] Rental, however, "does not have any employees, but rather owns and rents out tools and equipment used in the oil and gas industry, including certain tools and equipment that were provided to and used by [Services] in connection with the work on the LUCIOUS SPAR."[119] Services paid Rental for the use of those tools and equipment while performing work on the platform, thereby providing those tools to Services' employees.[120] Thus, this factor is neutral as to whether Plaintiff is Services' borrowed-employee.

7. *Was the new employment over a considerable length of time?*

"Where the length of employment is considerable, this factor supports a finding that the employee is a borrowed-employee."[121] In this case, Plaintiff worked on the LUCIOUS SPAR shortly after he began his employment with TMM,[122] which was "six or seven months before the accident happened."[123] Although it is not clear exactly how long Plaintiff worked on the LUCIOUS SPAR, it is undisputed that it was at the least two

---

[117] R. Doc. 99-2 at 4; R. Doc. 113-1 at 3.
[118] R. Doc. 99-6 at 2.
[119] *Id.* at 2–3.
[120] R. Doc. 99-6 at 2–3.
[121] *Capps*, 784 F.2d at 618.
[122] R. Doc. 99-2 at 2; R. Doc. 113-1 at 2.
[123] R. Doc. 113-10 at 5.

weeks.[124] In *Capps v. N.L. Baroid-NL Indus.*,[125] the Fifth Circuit considered whether the plaintiff, who was injured on his first day of work, could be considered a borrowed-employee. The Court explained, "In the case where the length of employment is considerable, this factor supports a finding that the employee is a borrowed-employee; however, the converse is not true. When the employee's injury occurs on the first day, it does not follow that the employee is not a borrowed-employee."[126] Thus, although Plaintiff might not have worked for Services for a "considerable amount of time," this factor alone does not preclude the Court's finding he is Services' borrowed-employee. Thus, the Court finds this factor is neutral.

8. *Who had the right to discharge the employee?*

The proper focus under this factor is whether the borrowing employer had the right to terminate the borrowed-employee's services with the borrowing employer.[127] This factor "asks whether the alleged borrowing employer has the right to terminate its relationship with the worker."[128] Looking to Plaintiff's deposition testimony, he understood that Services could have fired him "at any time."[129] According to Services' Vice-President of Operations, "If [Plaintiff were] not doing an adequate job or was not working to the satisfaction of the [Services] supervisors, . . . they [could] have fired him for this job or had him removed from the LUCIUS SPAR."[130] Plaintiff offers no evidence to dispute this fact, other than to point to the Master Service Contract,[131] which the Court

---

[124] R. Doc. 113-10 at 10–12.
[125] *Capps v. N.L. Baroid-NL Indus.*, 784 F.2d 615, 618 (5th Cir. 1986).
[126] *Id.*
[127] *Capps*, 784 F.2d at 618.
[128] *Butcher v. Superior Offshore Intern., LLC*, 754 F. Supp. 2d 829, 839 (E.D. La. 2010).
[129] R. Doc. 113-4 at 265–66.
[130] R. Doc. 99-5 at 20.
[131] R. Doc. 113-1 at 3.

previously noted states Rental "may terminate any particular work or service being performed under [the] contract at any time at its sole discretion."[132]

In *Melancon v. Amoco Production Co.*, the Fifth Circuit recognized that, for this factor to weigh in favor of borrowed-employee status, the alleged borrowing employer needs only to retain the authority to discharge the borrowed-employee from its employ, its projects, or its services.[133] The Fifth Circuit explained, specifically, that "Amoco [the borrowing employer] also had the right to discharge Melancon even though Amoco could not terminate Melancon's employment with Beraud [the lending employer]. Amoco's right to terminate Melancon's services in the Amoco field satisfied this requirement."[134]

In this case, because Services had the right to terminate Plaintiff's employment with Services, this factor weighs in favor of borrowed-employee status.

### 9. *Who had the obligation to pay the employee?*

"The determinative inquiry here is whether the alleged borrowing employer furnished the funds from which the original employer paid the plaintiff."[135] In this case, the parties agree that "Although Plaintiff's paychecks were issued by TMM, the amount he was paid depended on the number of hours he was working for [Services]."[136] Plaintiff argues that this factor weighs against borrowed-employee status, as Services "could not interfere with the employment relationship between Plaintiff and TMM," and "Plaintiff was paid exclusively by TMM."[137]

---

[132] R. Doc. 113-3 at 6.

[133] *Melancon*, 834 F.2d at 1246.

[134] *Id.* (citing *Capps*, 784 F.2d at 618; *Hebron*, 634 F.2d at 247).

[135] *Vincent*, 2015 WL 6758269, at *6.

[136] R. Doc. 99-2 at 4. Plaintiff "[a]cknowledge[s]" this assertion "to the extent that Plaintiff was paid based on the number of hours he worked on the LUCIUS SPAR," but clarifies that "Plaintiff was working on the LUCIUS SPAR pursuant to an agreement between TMM and Stranco Rental, LLC." R. Doc. 113-1 at 3. However, that TMM held a contract with Rental does not create a material factual dispute as to who paid Plaintiff and how. R. Doc. 113-1 at 3.

[137] R. Doc. 113-2 at 3.

The Court finds *Vincent v. Fieldwood Energy, L.L.C.*, a recent decision from a court in this district, instructive with respect to this *Ruiz* factor.[138] The *Vincent* court, faced with a payroll arrangement similar to the payroll arrangement in this case, summarized the relevant case law as follows:

> In *Brown,* the original employer paid the plaintiff, but his pay was based on time tickets that had to be verified daily by the alleged borrowing employer. *Brown,* 984 F.2d at 679. The Fifth Circuit wrote that this procedure supports borrowed-employee status. *Id.* Similarly, in *Hotard,* the alleged borrowing employer approved time sheets and paid the original employer an hourly rate for the plaintiff's work, and the original employer issued the plaintiff a check. *Hotard,* 308 F. App'x at 739. The Fifth Circuit wrote that this structure regarding the obligation to pay favors borrowed-employee status. *Id.*
>
> Here, deposition testimony establishes that Vincent turned in timesheets to Fieldwood for verification and approval. Wood Group then paid Vincent for hours that were approved, and Wood Group was reimbursed by Fieldwood for the hours worked by Vincent. This structure is the same as those in *Brown* and *Hotard,* so this factor favors borrowed-employee status.[139]

The Court also notes that, with respect to the ninth *Ruiz* factor, this case is on all fours with its prior decision in *Crawford v. BP Corp. North America, Inc.*[140] In *Crawford*, the Court found it significant that the plaintiff completed "daily time sheets," which, if approved by the alleged borrowing employer, resulted in the plaintiff's lending employer remitting the appropriate wages.[141] In this case, similar to *Vincent*, *Brown*, *Hotard*, and *Crawford*, Plaintiff's paycheck depended on the work he did for Services.[142] The Court finds that this factor weighs in favor of borrowed-employee status.

In summary, seven of the nine *Ruiz* factors weigh in favor of borrowed-employee status, and the remaining two are neutral. The Court finds as a matter of law that Plaintiff

---

[138] *See Vincent*, 2015 WL 6758269.
[139] *Id.*, at *6.
[140] *Crawford*, 2015 WL 1190123, at *4.
[141] *Id.*
[142] R. Doc. 99-5 at 20; R. Doc. 99-2 at 4; R. Doc. 113-4 at 340.

was a borrowed-employee of Services at the time of his injury. Services is thus vested with tort immunity, and Plaintiff's claims against Services must be dismissed.

Accordingly;

## IV.    CONCLUSION

**IT IS ORDERED** that Defendants' motion for summary judgment[143] as it relates to Stranco Rental, LLC is **GRANTED**, and Plaintiff's claims against Stranco Rental, LLC, be and hereby are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment[144] as it relates to Stranco Services, LLC is **GRANTED**, and Plaintiff's claims against Stranco Services, LLC, be and hereby are **DISMISSED WITH PREJUDICE**.

**New Orleans, Louisiana, this 2nd day of October, 2017.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[143] R. Doc. 47.
[144] R. Doc. 47.